Lincoln Combs, No. 025080
**O'STEEN & HARRISON, PLC**
300 W. Clarendon Ave., Suite 400
Phoenix, Arizona 85013-3424
T: (602) 252-8888 F: (602) 274-1209
lcombs@vanosteen.com

Ricardo de Anda (*pro hac vice pending*)
**DE ANDA LAW FIRM**
Plaza de San Agustin, 212 Flores Ave.
Loredo, TX 78040
T: (956) 726-0038 F: (956) 726-0030
deandalaw@gmail.com
*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## IN AND FOR THE STATE OF ARIZONA

| | |
|---|---|
| J.E.B., on behalf of himself and his minor child, F.B.; V.C.Y., and his minor child, G.G.C.J.; L.M.L., and her minor child, L.J.L. | Case No. |
| | **COMPLAINT** |
| Plaintiffs, | |
| vs. | |
| United States of America, | |
| Defendant. | |

## INTRODUCTION

1. This action seeks damages for asylum-seeking families forcibly separated by the United States ("U.S.") government in 2018 and wrongfully deported.

2. Plaintiffs J.E.B. (hereafter, "Elias") and his then ten-year-old son, F.B. (hereafter, "John") were forcibly separated by the U.S. government in February 2018.[1]

---

[1] For ease of reference and to protect Plaintiffs' identities, "Elias" and "John" are pseudonyms. Plaintiffs will file a separate motion to proceed under pseudonym.

3.    In February of 2018, federal officers forcibly separated Plaintiff Elias from his son John while they were detained at a U.S. Border Patrol facility in Yuma, Arizona. John was removed from Elias without informing Elias of his son's whereabouts. When Elias asked about his son's location, the officers told him they were not responsible for looking after him. Unbeknownst to Elias, his son was sent across the country to an ORR detention facility in Texas without a parent, guardian, or family member. John was subjected to prolonged detention inside various ORR detention facilities, where he was illegally doused with psychotropic drugs without parental consent, for ten months. The circumstances of his detention only heightened the agony of separation. Elias was not permitted to contact his son until three weeks after their separation.

4.    As a result of the Government's actions, Elias and John were separated for nearly ten months. They were subjected to abuse and neglect, which caused them substantial and irreparable harm and trauma, from which they continue to suffer.

5.    Plaintiffs V.C.Y. (hereafter, "Julio") and his then sixteen-year-old son, G.G.C.J., (hereafter, "Juan") were forcibly separated by the U.S. government in May of 2018.[2]

6.    In May of 2018, federal officers forcibly separated Plaintiff Julio from his son Juan while they were detained at a U.S. Border Patrol facility in Yuma, Arizona. Juan was removed from Julio without informing Julio of his son's whereabouts. Unbeknownst to Julio, his son was sent across the country to an ORR detention facility in Texas without a parent, guardian, or family member, where he was detained for almost four months. Julio was not permitted to contact his son until almost two weeks after their separation.

7.    As a result of the Government's actions, Julio and Juan were separated for nearly four months. They were reunited and placed in a family detention center for an additional two months. As a result, they were subjected to abuse and neglect, which caused

---

[2] For ease of reference and to protect Plaintiffs' identities, "Julio" and "Juan" are pseudonyms. Plaintiffs will file a separate motion to proceed under pseudonym.

them substantial and irreparable harm and trauma, from which they continue to suffer.

8.    Plaintiffs L.M.L., (hereafter, "Azul"), and her then sixteen-year-old son, L.J.L., (hereafter, "Pedro") were forcibly separated by the U.S. government on or about May 10, 2018.[3]

9.    In May of 2018, federal officers forcibly separated Plaintiff Azul from her six-year-old son Pedro while they were detained at a U.S. Border Patrol facility in Yuma, Arizona. Pedro was removed from Azul without informing Azul of her son's whereabouts. Unbeknownst to Azul, her son was sent across the country to an ORR facility in Cayuga, New York, where he was held in detention for three months.

10.    As a result of the Government's actions, Azul and Pedro were separated for three months. They were subjected to abuse and neglect, including being deported separately, which caused them substantial and irreparable harm and trauma, from which they continue to suffer.

11.    These were not random acts by rogue government officials. It was an intentional and unconstitutional policy designed to deter Central American families from seeking asylum and refuge in the United States. And the United States government's actions taken against Plaintiffs are consistent with actions taken against numerous other families.

12.    Indeed, several federal officials at the highest levels of the government made repeated public statements acknowledging the policy's purpose: to deter future asylum seekers. Despite widespread condemnation and a federal court's injunction requiring the government to reunite separated families and halt further separations, then-President Trump continued to defend the policy and family separations. In fact, even after a nationwide injunction was issued on June 26, 2018, families continued to be separated at the border despite there being no adequate basis to justify their separations.[4] As of June 2, 2021, the

---

[3] For ease of reference and to protect Plaintiffs' identities, "Azul" and "Pedro" are pseudonyms. Plaintiffs will file a separate motion to proceed under pseudonym.

[4] Gabby Del Valle & Jack Herrera, *The Pandemic-Era Rebrand of Family Separation*, NEW REPUBLIC (June 15, 2020), https://newrepublic.com/article/158178/pandemic-

Interagency Task Force on the Reunification of Families[5] identified 3,913 children in the United States government had separated from their families between July 1, 2017 and January 20, 2021.[6]

13.    As was the case with Plaintiffs, during these family separations, children were literally ripped from their parents' arms. Parents were not informed of their children's whereabouts or who was responsible for their children's well-being. Parents received horrific phone calls asking whether they were amenable to putting their children up for adoption. This trauma caused parents to experience severe depression and anxiety, which led many to contemplate or attempt suicide. Traumatized children were not provided with resources or treatment to address the fear, isolation, and abandonment they experienced or the lasting effects of separation and confinement.

14.    After children were separated from their families, the U.S. Department of Homeland Security ("DHS") deemed separated children to be unaccompanied and transferred them to the Health and Human Services Office of Refugee Resettlement ("ORR"), which is responsible for the long-term care and placement of unaccompanied non-citizen children.[7] However, DHS failed to take the most basic steps to record which children

era-rebrand-family-separation; Daniella Silva, Migrant Families Still Being Separated at the Border, Report from Texas Group Says, NBC NEWS (Feb. 20, 2019, 9:01pm), https://www.nbcnews.com/news/latino/migrant-families-still-being-separated-border-report-texas-group-says-n973766.

[5] On February 2, 2021, President Biden established the Interagency Task Force on the Reunification of Families through Executive Order 14011, with the stated intention of "reuniting] children separated from their families at the United States-Mexico border" and revoking former-President Trump's executive order that sought to justify separating children from their parents. Exec. Order No. 14011, 86 F.R. 8273 (Feb. 5, 2021), *available at* https://www.federalregister.gov/documents/2021/02/05/2021-02562/establishment-of-nteragency-task-force-on-the-reunification-of-families.

[6] *Initial Progress Report*, INTERAGENCY TASK FORCE ON THE REUNIFICATION OF FAMILIES (June 2, 2021), *available at* https://www.dhs.gov/sites/default/files/publications/21_0602_s1_family-reunification-task-force-120-day-progress-report.pdf.

[7] Off. of Inspector Gen., U.S. Dep't of Homeland Sec., OIG-18-84, *Special Review – Initial*

belonged to which parents, emphasizing the government's utter indifference to the lives and well-being of these separated families. In fact, the federal judge who ordered the government to reunify families in July 2018 noted that the government was more efficient and accurate in tracking property than unaccompanied non-citizen minors.[8]

15.    The United States is liable for the conduct that harmed Plaintiffs under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(I), 2671, et. seq. ("FTCA").

16.    Although separated families can never be made whole for the suffering and trauma they experienced, Plaintiffs are, at minimum, entitled to compensatory redress for the immeasurable harms they suffered at the hands of the United States government.

## JURISDICTION AND VENUE

17.    This Court has jurisdiction over the subject matter of this Complaint under 28 U.S.C. §§ 1331, 1346 (b), and the FTCA, 28 U.S.C. §§ 2671-2680.

18.    On November 11, 2021 Plaintiffs submitted administrative claims to DHS, U.S. Customs and Border Protection ("CBP"), U.S. Immigration and Customs Enforcement (ICE"), and U.S. Department of Health and Human Services ("HHS"). None of these agencies has made a final disposition on any of the Plaintiffs' administrative claims and, as six months have passed since Plaintiff's submission of the claims, they are deemed finally denied. 28 U.S.C. § 1402(b) as the acts and omissions which are the subject of this Complaint occurred in this District.

19.    Venue is proper in this District under 28 U.S.C. § 1402(b) as the acts and

---

*Observations Regarding Family Separation Issues Under the Zero Tolerance Policy*, at 3 (Sept. 27, 2018), https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-84-Sep18.pdf (hereinafter "DHS OIG Report I").

[8] *Ms. L. v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 1133, 1143–44 (S.D. Cal. 2018), *modified*, 330 F.R.D. 284 (S.D. Cal. 2019) ("In effect, these parents have been left 'in a vacuum, without knowledge of the well-being and location of their children, to saynothing of the immigration proceedings in which those minor children find themselves.'") (quoting *United States v. Dominguez-Portillo*, No. EP-17-MJ-4409-MAT, 2018 WL 315759, at *14 (W.D. Tex. Jan. 5, 2018)).

omissions which are the subject of this Complaint occurred in this District.

**PARTIES**

20.    Plaintiffs Elias and John are Guatemalan nationals currently residing in Chatsworth, Georgia. Elias is the father of Plaintiff John, who was ten years old at the time of the separation. Elias and John entered the United States together on or around January 18, 2018, and were separated in Arizona. Elias was detained in Arizona for approximately two months before being deported to Guatemala. After being forcibly separated from his father, John was transferred to and held at ORR detention facilities in Texas, including the Shiloh Treatment Center, where he was illegally treated with psychotropic drugs against Texas law and without his parents' consent. He was held for ten months by ORR before being deported without adequate medication or a plan to treat his medical condition, all contrary to ORR regulation.

21.    Plaintiffs Julio and Juan are Guatemalan nationals currently residing in Lebanon, Kentucky.  Julio is the father of Plaintiff Juan, who was 16 years old at the time of the separation. Julio and Juan entered the United States together on or around May 13, 2018, and were separated in Arizona. Julio and Juan were detained by defendant for approximately six months before being deported to Guatemala. After being forcibly separated from his father, Juan was illegally transferred to and held at ORR detention facilities in Texas. He was held for four months by ORR before being reunited with his father and held for an additional two months in a family detention facility.

22.    Plaintiffs Azul and Pedro are Guatemalan nationals currently residing in Plainfield, New Jersey.  Azul is the mother of Plaintiff  Pedro, who was six years old at the time of the separation. Azul and Pedro entered the United States together on or around May 10, 2018, and were separated in Arizona. Azul was detained for approximately one month before being deported to Guatemala, without her son. After being forcibly separated from his mother, Pedro was illegally transferred to and held at ORR detention facilities in New York. He was held for three months by ORR before being deported to Guatemala without

his mother.

23.     Defendant is the United States of America, acting by and through DHS, HHS, and the Department of Justice ("DOJ") (collectively, "federal agencies") of the United States under 28 U.S.C. § 2671, and their employees, officers, agents, including but not limited to CBP and ICE, subcomponent agencies of DHS that are under the direction, authority, and control of the Secretary of Homeland Security, and control of the Secretary of Health and Human Services; and the Office of the Attorney General within the DOJ.

24.     The federal officers referenced in this Complaint were at all relevant times employees of the United States, working within the scope and course of their employment with the federal agencies listed above.

25.     DHS employees were responsible for separating Elias from his son, Julio from his son, and Azul from her son. DHS employees are also responsible for supervising and managing detained individuals at CBP and Ice facilities, including those located in Arizona where Plaintiffs were initially detained.

26.     HHS employees are responsible for supervising and managing the detention of children the government classifies and unaccompanied, including at facilities in Florida, where John, Juan, and Pedro were detained while separated from their parents.

27.     High-ranking officials from DHS, HHS, DOJ, and the White House worked together to design and implement the unlawful and unconstitutional family separation policy, pursuant to which Plaintiffs were separated and subjected to significant harm.

28.     At all relevant times, all DHS, CBP, and ICE employees referenced in this Complaint who interacted with Plaintiffs were acting as investigative or law enforcement officers. 28 U.S.C. § 2680(h).

## STATEMENT OF FACTS

### A.  THE FAMILY SEPARATION POLICY

29.     The United States developed and implemented an inhumane policy that took thousands of children from their parents for the purpose of deterring future immigrants from

seeking asylum in the United States. This policy was specifically enacted to cause immense trauma and harm to these families, in violation of the United States Constitution and common law. The House Committee on the Judiciary has referred to this policy as one marked by "reckless incompetence and intentional cruelty."[9]

1. **The purpose of the Family Separation Policy was to deter future Central American asylum seekers.**

30.    A central tenet of the Trump administration's immigration policy was to deter Central Americans from seeking asylum and refuge in the United States.[10]

31.    As early as February 2017, a proposal to routinely separate asylum-seeking parents from their children at the border was discussed at a meeting between senior federal officials from ORR, DOJ, CBP, and ICE at the office of the CBP Commissioner.[11]

---

[9] H.R. Judiciary Comm., *The Trump Administration's Family Separation Policy: Trauma, Destruction, and Chaos*, at 2 (Oct. 2020), https://judiciary.house.gov/uploadedfiles/the_trump_administration_family_separation_p olicy_trauma_destruction_and_chaos.pdf?utm_campaign=4526-519 (hereinafter "House Committee Report").

[10] *See, e.g.,* Kevin Lemarque, *US Judge Bars Trump Administration From Enforcing Asylum Ban*, CNBC (Nov. 20, 2018, 2:04 AM). https://www.cnbc.com/2018/11/20/immigration-policy-judge-bars-us-from-enforcing-trump-asylum-ban.html; Shaw Drake & Edgar Saldivar, *Trump Administration Is Illegally Turning Away Asylum Seekers*, ACLU (Oct. 30, 2018, 1:30 PM), https://www.aclu.org/blog/immigrants-rights/trump-administration-illegally-turning-away-asylum-seekers; Emma Platoff, Alexa Ura, Jolie McCullough & Darla Cameron, *While Migrant Families Seek Shelter from Violence, Trump Administration Narrows Path to Asylum*, TEX. TRIB. (July 10,2018,12:00 AM), https://www.texastribune.org/2018/07/10/migrant-families-separated-border-crisis-asylum-seekers-donald-trump/; Glenn Thrush, *U.S. to Begin Blocking Asylum Seekers From Entering Over Mexican Border*, N.Y. TIMES (Jan. 24, 2019), https://www.nytimes.com/2019/01/24/us/politics/migrants-blocked-asylum-trump.html; Yeganeh Torbati & Kristina Cooke, *Trump Administration Moves to Curb Migrants' Asylum Claims*, REUTERS (Nov. 8, 2018), https://www.reuters.com/article/us-usa-immigration-asylum/trump-administration-moves-to-curb-migrants-asylum-claims-idUSKCN1ND35K.

[11] *See* H.R. Subcomm. on Oversight & Investigations, Comm. on Energy & Com., Unofficial Hr'g Tr. at 1012–24, 1131–38, 2058–64 (Feb. 7, 2019),

32.     By mid-2017, the Trump administration began separating children from their families as part of a pilot program in El Paso, Texas (the "El Paso Initiative").[12]

33.     As part of the El Paso Initiative, any adult who illegally crossed the border was detained and criminally charged with a misdemeanor. If the parent had a child, that child was taken from them and designated as an unaccompanied minor. The government then proceeded to place these children into the custody of ORR.[13] Parents were unable to communicate with their children because the government failed to properly tack separated families, nor did the federal agencies or their employees establish a system to reunify families after separation.[14] CBP separated approximately 280 families from July to November 2017—"an increase from prosecuting 0 percent of adults with a family the month before the initiative began to prosecuting 15 percent during the initiative."[15]

34.     During the El Paso Initiative, judges, prosecutors, and advocates voiced

---

https://energycommerce.house.gov/sites/democrats.energycommerce.house.gov/files/documents/HIF038.020%20-%20OI%20-%20Hrg%20-%202019%20Feb%2007%20-%20UNEDITED.pdf (testimony of Commander Jonathan White, U.S. Pub. Health Serv. Commissioned Corps, U.S. Dep't of Health & Human Servs.) (hereinafter "White Testimony").

[12] Southern Poverty Law Center, *Family Separation Under the Trump Administration*, SPLC (June 17, 2020), https://www.splcenter.org/news/2020/06/17/family-separation-under-trump-administration-timeline; *see also* Julia Edwards Ainsley, *Exclusive: Trump Administration Considering Separating Women, Children at Mexico Border*, REUTERS (Mar. 3, 2017, 12:13 PM), https://www.reuters.com/article/us-usa-immigration-children/exclusive-trump-administration-considering-separating-women-children-at-mexico-border-idUSKBN16A2ES ("[DHS]continually explores options that may discourage those from even beginning the journey" north from Central America to the U.S. border).

[13] *See, e.g.*, *United States v. Dominguez-Portillo*, No. 17-MJ-4409, 2018 WL 315759, at *1 (W.D. Tex. Jan. 5, 2018), *aff'd sub nom.*, *United Sates v. Vasquez-Hernandez*, 314 F. Supp. 3d 744 (W.D. Tex. 2018), *aff'd*, 924 F.3d 164 (5th Cir. 2019).

[14] House Committee Report, *supra* note 7, at 9–10, 21.

[15] Off. of Inspector Gen., U.S. Dep't of Homeland Sec., OIG-20-06, *DHS Lacked Technology Needed to Successfully Account for Separated Migrant Families*, at 14 (Nov. 25, 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-11/OIG-20-06-Nov19.pdf (hereinafter "DHS OIG Report II").

concern that children were being separated from their parents, and that separated families were given no information about each other's whereabouts or well-being.[16]

35.     Prior to the El Paso Initiative, unaccompanied minors who arrived at ORR were typically those who had arrived in the U.S. unaccompanied by a parent or guardian. Historically, as no parent or guardian accompanied the newly arrived minors, ORR had no need to (and did not) track the relationship between unaccompanied minors in its care to their parents.

36.     When the El Paso Initiative began, minors who were accompanied by a parent or guardian when they arrived in the U.S. were forcibly separated from their parent or guardian and were then falsely and incorrectly classified by CBP as "unaccompanied."

37.     Despite the novel need to track these new "unaccompanied" minors in its care to their parents and guardians in DHS custody, ORR did not implement a method for tracking separated children and parents.

38.     As the conclusion of the El Paso Initiative, CBP headquarters became aware of a "deficiency" in its records systems that prevented government officials from tracking separated children and their parents.[17] Although CBP headquarters was aware of this deficiency, they failed to implement any changes to the records systems, leading to a catastrophic failure to reunite families separated under the Trump administration's later-enacted zero-tolerance policy.[18]

39.     By late 2017, the government was separating families in targeted parts of the U.S.-Mexico border, including families arriving through official ports of entry. Despite the fact that ORR voiced concerns about lacking the systems needed to handle an increase in

---

[16] Off. of Inspector Gen., U.S. Dep't of Justice, 21-028, *Review of the Department of Justice's Planning and Implementation of its Zero Tolerance Policy and its Coordination with the Departments of Homeland Security and Health and Human Services*, at 32 (Jan. 2021), https://oig.justice.gov/sites/default/files/reports/21-028_0.pdf (hereinafter "DOJ OIG Report").

[17] DHS OIG Report II, *supra* note 13, at 14.

[18] *Id.* at 14–15.

children that had been separated from their parents and re-classified as unaccompanied, ORR was specifically instructed not to take steps to prepare for future increases, given that there was no official "policy" of separating families. [19]

40.    In December 2017, senior Justice department officials and DHS exchanged a memorandum entitled "Policy Options to Respond to Border Surge of Illegal Immigration".[20] The memorandum made clear that the Trump administration intended to pursue a policy whereby they would separate family units and prosecute parents.[21]

41.    In a section titled "Separate Family Units", the memorandum stated that adults would be placed in adult detention while children would be placed in HHS custody.[22] In another section entitled "Increased Prosecution of Family Unit Parents," the memorandum stated that "parents would be prosecuted for illegal entry…and the minors present with them would be placed in HHS custody as [unaccompanied minors]."[23] The memorandum further stated that "the increase in prosecutions would be reported by the media and it would have substantial deterrent effect."[24]

42.    Notwithstanding the concerns expressed by prosecutors, judges, and others about the implementation of the El Paso Initiative, on April 6, 2018, the Trump administration's Attorney General Jeff Sessions issued a memorandum to all federal

---

[19] See White Testimony, supra note 9.

[20] *Policy Options to Respond to Border Surge of Illegal Immigration* (Dec. 16, 2016), https://www.splcenter.org/sites/default/files/72.6_-_3d_am.compl_._exh._5_leaked_memo_01-18-2019.pdf (hereinafter "Policy Options"); *see also* Priscilla Alvarez, *What the 2017 Draft Memo Reveals About the Administration's Family Separations Policy*, CNN (Jan. 18, 2019, 1:47 PM), https://www.cnn.com/2019/01/18/politics/draft-memo-significance/index.html.

[21] In addition to this memorandum, then-Secretary of Homeland Security Kirsten Nielsen also initiated efforts to formally develop and implement a family separation policy. *See* House Committee Report, *supra* note 7, at 10.

[22] *Policy Options*, *supra* note 18.

[23] *Id.*

[24] *Id.*

prosecutors entitled "Renewed Commitment to Criminal Immigration Enforcement," which mandated that each United States Attorney's Office issue a "zero-tolerance" policy. A zero-tolerance policy required the prosecution of all noncitizens who crossed the United States border between ports of entry with misdemeanor improper entry under 8 U.S.C. § 1325. The announcement of the zero-tolerance policy "referenc[ed] the [El Paso] Initiative as a basis for expanding referrals of family unit adults throughout the Southwest border," while ignoring "the challenges encountered during the El Paso Initiative, including the government's inability to reunify separated families."[25]

43.    Also on April 6, 2018, then-President Trump issued a Presidential Memorandum entitled "Ending 'Catch and Release' at the Border of the United States and Directing Other Enhancements to Immigration Enforcement."[26] This memorandum directed the Secretary of Homeland Security, the Secretary of Defense, the Attorney General, and the Secretary of HHS to submit a report to the President identifying all of the measures the various departments had implemented to end "Catch and Release" practices.

44.    On May 4, 2018, citing "recent presidential direction and guidance from the Attorney General," the DHS Secretary executed a memorandum directing Border Patrol sectors to "refer for prosecution all adults apprehended for crossing the border illegally," expressly including parents who entered the United States with their children.[27]

45.    In prior administrations, asylum seekers, especially families, had not been systematically referred for prosecution for the misdemeanor of crossing the border illegally.[28] Instead, DHS would either detain and administratively remove the family from the United States or give the family a Notice to Appear before an Immigration Judge and

---

[25] DOJ OIG Report, *supra* note 14, at 22, 31–32.

[26] 83 Fed. Reg. 16, 179.

[27] DOJ OIG Report, *supra* note 14, at 32.

[28] This was done, in part, to conserve the resources of DOJ prosecutors and avoid having them take on misdemeanor prosecutions.  *See* DOJ OIG Report, *supra* note 14

release them on their own recognizance into the community where they would await their hearing in Immigration Court.[29] This latter practice became derogatorily known as "Catch and Release."

46. Over the last 20 years, fewer than one-third of apprehensions by CBP have resulted in criminal prosecutions, and any sentences imposed have tended to be short, ranging from two to fifteen days.[30]

47. Against that backdrop, the purpose of the zero-tolerance policy was clear. It was enacted to deter individuals from seeking asylum or otherwise coming to the United States. The Trump administration intended to deter further immigration by separating families and causing these individuals irreparable suffering and trauma, with no mechanism in place to reunify separated families.[31]

48. The United States government knew that the zero-tolerance policy would cause enormous trauma for these families—indeed, the cruelty of the policy was the point.[32] For example, in September 2016, the DHS Advisory Committee on Family Residential Centers issued a report concluding that "the detention or the separation of families for

---

[29] *Id.* at 1–2.

[30] *"Zero Tolerance" at the Border: Rhetoric vs. Reality*, TRAC (July 24, 2018), https://trac.syr.edu/immigration/reports/520/.

[31] DHS OIG Report II, *supra* note 13, at 14 n.20.

[32] Laura Santhanam, *How Detention Causes Long-Term Harm to Children*, PBS (Aug. 22, 2019, 6:18 PM), https://www.pbs.org/newshour/health/how-detention-causes-long-term-harm-to-children ("[Pediatrician] Linton also saw regressive behavior and cognitive delays emerge from detained children soiling themselves, detachment, temper tantrums in older children, rolling back speech milestones and difficulty completing tasks. No amount of time in detention is safe for immigrant children, she said."); *see also* Hajar Habbach, MA, Kathryn Hampton, MSt, and Ranit Mishori, MD, MHS, *"You Will Never See Your Child Again" The Persistent Psychological Effects of Family Separation*, PHR (Feb. 25, 2020), https://phr.org/our-work/resources/you-will-never-see-your-child-again-the-persistent-psychological-effects-of-family-separation/ ("PHR finds that the U.S. government's treatment of asylum seekers through its policy of family separation constitutes cruel, inhuman, and degrading treatment and, in all cases evaluated by PHR experts, rises to the level of torture.")

purposes of immigration enforcement or management, or detention is never in the best interest of children. DHS should discontinue the general use of family detention…"[33] Additionally, Commander Jonathan White, former Deputy Director of ORR for the Unaccompanied [Noncitizen] Children's program, testified before Congress that he had repeatedly warned those devising the policy that family separations could lead to significant harm and trauma.[34]

49.     Several officials' comments on the policy further confirmed its goal was to harm families through forcible and prolonged separation to deter immigration to the United States. On May 11, 2018, John Kelly, President Trump's then-Chief of Staff, said to NPR that "a big name of the game is deterrence…It could be a tough deterrent—would be a tough deterrent.[35] The children will be taken care of—put into foster care or whatever."[36]

50.     On June 19, 2018, Steven Wagner, Assistant Secretary of HHS, stated "[w]e expect that the new policy will result in a deterrence effect, we certainly hope that parents stop bringing their kids on this dangerous journey and entering the country illegally."[37]

51.     On October 13, 2018, former President Trump said to reporters that "if

---

[33] U.S. Immigr. & Customs Enf't, Dep't of Homeland Sec., *Rep. of the DHS Advisory Committee on Family Residential Centers*, at 2, 10 (Sept. 30, 2016), https://www.ice.gov/sites/default/files/documents/Report/2016/ACFRC-sc-16093.pdf.

[34] Jeremy Stahl, *The Trump Administration Was Warned Separation Would Be Horrific for Children, Did it Anyway*, SLATE (July 31, 2018, 5:05 PM), https://slate.com/news-and-politics/2018/07/the-trump-administration-was-warned-separation-would-be-horrific-for-children.html.

[35] *Transcript: White House Chief of Staff John Kelly's Interview with NPR*, NPR (May 11, 2018, 11:36 AM), https://www.npr.org/2018/05/11/610116389/transcript-white-house-chief-of-staff-john-kellys-interview-with-npr.

[36] *Id.* (emphasis added).

[37] Phillip Bump, *Here Are the Administrative Officials Who Have Said That Family Separation is Meant as Deterrent*, WASH. POST (June 19, 2018, 9:14 AM), https://www.washingtonpost.com/news/politics/wp/2018/06/19/here-are-the-administration-officials-who-have-said-that-family-separation-is-meant-as-a-deterrent/.

[immigrants] feel there will be separation, they don't come."[38] And again on December 16, 2018, then-President Trump tweeted, "if you don't separate, FAR more people will come."[39]

52.     Despite these public statements, the government claimed it had to separate families because children could not be housed in jails after their parents were prosecuted for illegally crossing the border. This rationale was pretextual. The government's policy of separating children was a mandatory policy that, as implemented, required CBP and ICE agents to separate children from their families, ***even if the parents were not targeted for prosecution***, as was the case with Plaintiffs.

53.     A two-year inquiry by the Justice Department's inspector general confirmed the policy's pretextual rationale in a January 2021 report. The report revealed that in May 2018, then-Attorney General Sessions told U.S. attorneys on a conference call, "We need to take away children."[40] "If [sic] care about kids, don't bring them in. Won't give amnesty to people with kids."[41] Also, in May 2018, talking points drafted for Mr. Sessions for use at a White House meeting explained that "DHS should consider…administrative separation of family units," even where the parent is nor referred for prosecution.[42]

54.     The report further revealed that Rod Rosenstein, then-Deputy Attorney General, went even further on a subsequent call, telling U.S. attorneys that "it did not matter

---

[38] *Remarks by President Trump Before Marine One Departure*, LEGISTORM (Oct. 13, 2018, 3:52 PM),
https://www.legistorm.com/stormfeed/view_rss/1369143/organization/69295.html.

[39] Donald Trump (@realdonaldtrump), TWITTER (Dec. 16, 2018, 11:24 AM), https://twitter.com/realDonaldTrump/status/1074339834351759363 (emphasis in original).

[40] DOJ OIG Report, *supra* note 14, at 39; *see also* Michael D. Shear, Katie Benner & Michael S. Schmidt, "'*We Need to Take Away Children,' No Matter How Young, Justice Dept. Officials Said*, N.Y. TIMES (Oct. 6, 2020), https://www.nytimes.com/2020/10/06/us/politics/family-separation-border-immigration-jeff-sessions-rod-rosenstein.html?referringSource=articleShare.

[41] Shear, Benner & Schmidt, *supra* note 38.

[42] DOJ OIG Report, *supra* note 14, at 30–31.

how young the children were" and that government lawyers should not have refused to prosecute two cases simply because the children were barely more than infants.[43]

55.     Both Mr. Sessions and Mr. Rosenstein knew that strict implementation of the zero-tolerance policy would result in DHS changing its longstanding policy and referring for criminal prosecution adult family unit members who entered the country with children without regard for the separation of families.[44]

56.     Likewise, after a nearly two-year investigation, the House Committee on the Judiciary issued a report concluding that "[w]ithin weeks of President Trump's inauguration, the Administration began formulating a plan to separate parents from their children as a means to deter migration."[45] Before a formal policy had even been developed, "the Administration was accelerating family separations."[46]

57.     According to officials involved in orchestrating the zero-tolerance policy, then-President Trump's senior adviser Stephen Miller "saw the separation of families not as an unfortunate byproduct but as a tool to deter more immigration," and "with the support of [Attorney General] Sessions, advocated for separating all immigrant families, even those going through civil court proceedings."[47]

58.     This, from the policy's earliest days, Justice Department officials understood and **_encouraged_** the separation of children as an expected part of the desire to prosecute all undocumented immigrants crossing the border. Mr. Sessions and other senior department officials "were aware that full implementation of the zero tolerance policy would result in

---

[43] Shear, Benner & Schmidt, *supra* note 38.

[44] DOJ OIG Report, *supra* note 14, at 8.

[45] House Committee Report, *supra* note 7, at 21.

[46] *Id.* ("By March 2017, the number of separated children transferred to ORR custody had increased by nearly 900 percent, as compared to November 2016.").

[47] Julia Ainsley & Jacob Soboroff, *Trump Cabinet Officials Voted in 2018 White House Meeting to Separate Migrant Children, Say Officials*, NBC News (Aug. 20, 2020, 12:15 PM), https://www.nbcnews.com/politics/immigration/trump-cabinet officials-voted-2018-white-house-meeting-separate-migrant-n1237416.

criminal referrals by D.H.S. of adults who enter the country illegally with children and that the prosecution of these family unit adults would result in children being separated from families."[48]

## 2. **The implementation of the Family Separation Policy and the illegal and inhumane conditions of the detention facilities.**

59.     On the ground in Arizona and elsewhere, the government effectuated family separations in a cruel and brutal fashion. Many children were forcibly taken from their parent's arms over the pleas of both parent and child. This compounded the stress and anxiety for other families who witnessed these separations, as they felt it was only a matter of time before the government separated them. Parents, including Plaintiffs, were lied to and deceived.

60.     Plaintiffs were told they and their children would be reunited in Arizona. Their children were instead sent to Texas—a place Plaintiffs had never heard of.

61.     All of the parents whose children were forcibly separated by the U.S. government, including Plaintiffs, were left with little to no information for hours, days, weeks, and months as to where their children were, how they were doing, and if and when they would be reunited.

62.     Once families were separated, the government classified the children as "unaccompanied," even though these children had been accompanied by their guardians until the government separated them. These children were then transferred into ORR custody, which is responsible for the long-term care and placement of "unaccompanied [non-citizen] children." 6 U.S.C. § 279(a). During these prolonged separations, children were prevented from talking with their parents for weeks or months, which also heightened their trauma. Indeed, after family separations began without advance notice to the U.S. Marshals Service ("USMS"), the USMS did not have policies or procedures to facilitate communications

---

[48] Shear, Benner & Schmidt, *supra* note 38; *see also* DOJ OIG Report, *supra* note 14.

between migrant children in HHS ORR custody and their parents in USMS custody, which resulted in delays in establishing contacts between separated family members.[49] For many children, communication came only after the child's case worker or lawyer tracked down their parents.

63. Once separated, parents and children also had to endure squalid and inhumane conditions at these detention facilities. The conditions at the detention centers—the kind in which Plaintiffs and their children were held—have been widely documented and deemed unconstitutional.

64. A July 2019 report from DHS's Office of the Inspector General (the "July OIG Report") described standing-room-only cells, children without showers and hot meals, and detainees begging for release.[50] The report further revealed that children had "few spare clothes and no laundry facilities." Many migrants were given only wet wipes to clean themselves and bologna sandwiches to eat, causing constipation and other health problems.[51]

65. The July OIG report described overcrowding so severe that when the agency's internal inspectors visited some of the facilities, migrants banged on cells and pressed notes to windows begging for help. At once facility, some single adults were held in standing-room-only conditions for a week, and at another, some single adults were held more than a month in overcrowded cells.[52]

66. The July OIG report further described reporting from doctors in Texas who care for children released from these facilities. These doctors reported that at least six migrant

---

[49] See DOJ OIG Report, *supra* note 14, at 58.

[50] Off. of Inspector Gen., U.S. Dep't of Homeland Sec., OIG-19-51, *Management Alert – DHS Needs to Address Dangerous and Prolonged Detention of Children and Adults in the Rio Grande Valley* (Jul. 2, 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-07/OIG-19-51-Jul19.pdf.

[51] *Id.*

[52] *Id.*

children died in federal custody or shortly after their release.[53] They recounted "children having lifesaving medication taken away, or released with serious ailments but without any medical records from the time they were detained."[54] Parents and children alike suffered and continue to suffer physically, mentally, and/or emotionally due to these conditions and the traumatic separation they endured.

67.    These inhumane and unsafe conditions violate federal law and policy requiring that minors who are detained by CBP or other DHS agencies, or who are held in HHS custody, be held in "facilities that are safe and sanitary," and that account for the "particular vulnerability of minors."[55] These conditions further violate requirements that minors detained by CBP be provided access to toilets and sinks, adequate temperature control and ventilation, drinking water and food, as well as "medical assistance if the minor is in need of emergency services."[56]

68.    In February 2020, Judge Bury of the U.S. District Court for the District of Arizona granted a permanent injunction finding that the conditions in detention facilities in Border Patrol's Tucson Sector were unconstitutional.[57] Judge Bury's order held that "floor-sleeping, with or without a mattress, [offends] 'basic' concepts of decency, as well as reasonable respect for constitutional rights."[58] The order further held that the detention

---

[53] *Id.*

[54] Zolan Kanno-Youngs, *Squalid Conditions at Border Detention Centers, Government Report Finds*, N.Y. TIMES (July 2, 2019), https://www.nytimes.com/2019/07/02/us/politics/border-center-migrant-detention.html.

[55] Stipulated Settlement Agreement ¶ 12.A, *Flores v. Reno*, No. 85-CV-4544 (C.D. Cal. Jan. 17, 1997) (hereinafter "Flores Consent Decree").

[56] *Id.*

[57] Findings of Fact and Conclusions of Law, *Doe v. Wolf*, No. CV-15-00250-TUC-DCB, (D. Ariz. Feb. 19, 2020), ECF No. 482 (holding "that each of the conditions of confinement existing in the CBP holding cells described above, and all of them together, are presumptively punitive because they are more restrictive than the conditions of confinement described above as existing for pretrial detainees held in jails or prisons…").

[58] *Id.* at 36.

system failed to meet the most basic human needs because, among other factors, the detention centers were uncomfortably cold, had no beds, the mylar blankets were insufficient to provide body warmth, the facilities were overcrowded, and sleeping was constantly interrupted. Plaintiffs here endured similar, if not worse conditions, upon being detained.[59]

### 3. The disastrous attempt at reunification.

69.    The government failed to take even the most basic steps to develop a reunification system for separated families.

70.    Despite the fact that tracking separated children was as easy as adding a checkbox to an ORR/DHS referral page,[60] these two agencies primarily responsible for implementing the policy developed no "consistent way to indicate in their data systems children and parents separated at the border "until at least the summer of 2018."[61]

71.    Yet, the government had been on notice from the El Paso Initiative that its databases could not properly track families once the child was separated from the parent. The El Paso Initiative revealed that CBP personnel "relied on local spreadsheets to document family separations," which led to data errors and "prevented ICE and CBP personnel in other locations from seeing where El Paso Sector Border Patrol agents had separated family members."[62]

72.    El Paso sector CBP officials notified CBP headquarters about the lack of

---

[59] *Id.*

[60] Oversight of the Trump Administration's Family Separation Policy: Hearing Before the H. Comm. on the Judiciary, at 4 (Feb. 26, 2019) (statement of Scott Lloyd, Senior Advisor, Center for Faith and Opportunity Initiatives, U.S. Dep't of Health and Human Servs.), https://docs.house.gov/meetings/JU/JU00/20190226/108872/HHRG-116-JU00-Wstate-LloydS-20190226.pdf.

[61] U.S. Gov't Accountability Off., GAO-19-163, *Unaccompanied Children: Agency Efforts to Reunify Children Separated from Parents at the Border*, at 21 (Oct. 2018), https://www.gao.gov/assets/700/694918.pdf (hereinafter "GAO Report") ("HHS officials told us that there were no specific procedures to reunite children with parents from whom they were separated at the border prior to the June 2018 court order.").

[62] DHS OIG Report II, *supra* note 13, at 15.

functionality to track family separations in their computer systems, but headquarters failed to make any changes or improvements.[63]

73.    In September 2019, DHS OIG noted that the "lack of integration between CBP's, ICE's, and HHS's respective information technology systems hindered efforts to identify, track, and reunify parents and children separated under the Zero Tolerance policy" and that "[a]s a result, DHS has struggled to provide accurate, complete, reliable data on family separations and reunifications, raising concerns about the accuracy of its reporting."[64] Although DHS claimed that DHS and HHS had a "central database" containing location information on separated families, OIG found no evidence that such a database existed.[65]

74.    The inaccurate data and lack of a centralized system left parents without the ability to communicate with their children for weeks, or even worse, months. Parents were forced to wait in detention while wondering when, if ever, they would be reunited with their children. The government's absolute failure to adequately track and reunite families only intensified the damage these families experienced due to the "zero-tolerance" policy.

75.    In an acknowledgement of the enduring psychological harm caused by forcibly taking children from their parents at the border with no guarantee of when or how they would be reunited, Judge Kronstadt of the United States District Court for the Central District of California took the step in November 2019 of ordering the government to immediately make available mental health screenings and treatment to thousands of forcibly

---

[63] Id. at 14–15.

[64] DHS OIG Report I, *supra* note 5, at 11 ("OIG requested a list of every [noncitizen] child separated from an adult since April 19, 2018, as well as basic information about each child, including the child's date of birth; the child's date of apprehension, separation, and (if applicable) reunification; and the location(s) in which the child was held in DHS custody. It took DHS many weeks to provide the requested data…[m]oreover, the data DHS eventually supplied was incomplete and inconsistent, raising questions about its reliability.").

[65] *Id.*

separated families who remain in the United States.[66]

### 4. The "Zero-Tolerance" policy prompted severe public backlash, yet family separations persisted.

76.     The separation of families prompted widespread public backlash and criticism. Ravina Shamdasani, a spokeswoman for the Office of the United Nations High Commissioner for Human Rights, stated that the practice of family separation "amounts to arbitrary and unlawful interference in family life, and is a serious violation of the rights of the child."[67] Pope Francis criticized the family separation policy and described the "Zero-Tolerance" policy as "immoral" and "contrary to our Catholic values."[68] On June 18, 2018, ProPublica released audio that it had obtained from a CBP facility of children crying in the background after being separated from their families.[69]

77.     After such severe public backlash, then-President Trump relented, and on June 20, 2018, signed an executive order purporting to end the "zero-tolerance" policy. Shifting blame onto Congress, former President Trump stated that it was "unfortunate that Congress's failure to act and court orders have put the administration in the position of separating [noncitizen] families to effectively enforce the law."[70] This executive order, however, did

---

[66] Civil Minutes, *Ms. J.P. v. Sessions*, No. 2:18-cv-06081-JAK-SK (C.D. Cal. Nov. 5, 2019), ECF No. 251.

[67] Nick Cumming-Bruce, *Taking Migrant Children From Parents Is Illegal, U.N. Tells U.S.*, N.Y. TIMES (June 5, 2018), https://www.nytimes.com/2018/06/05/world/americas/us-un-migrant-children-families.html.

[68] Jason Horowitz, *Pope Francis Criticized Family Separations Before Policy's Reversal*, N.Y. TIMES (June 20, 2018), https://www.nytimes.com/2018/06/20/world/europe/pope-francis-trump-child-separation.html.

[69] Ginger Thompson, *Listen to Children Who've Just Been Separated From Their Parents at the Border*, PROPUBLICA (June 18, 2018, 3:51 PM), https://www.propublica.org/article/children-separated-from-parents-border-patrol-cbp-trump-immigration-policy.

[70] Politico Staff, *Full Text: Trump's Executive Order Ending Family Separations*, POLITICO (June 20, 2018, 4:12 PM), https://www.politico.com/story/2018/06/20/full-

not address how the thousands of children separated from their families would be reunited. In fact, a United States Government Accountability Office report noted "that there were no specific procedures to reunite children with parents from whom they were separated at the border."[71] These reunification procedures came only after a federal judge ordered the government to reunite separated families.[72]

78. On June 26, 2018, in *Ms. L. v. ICE*, Judge Sabraw issued a class-wide preliminary injunction and ordered the government to reunify families.[73] Previously, the court had held that the plaintiffs had stated a cognizable claim for violation of their substantive due process rights to family integrity under the Fifth Amendment to the United States Constitution based on the government's practice of separating the plaintiffs from their minor children.[74] After the executive order was issued, Judge Sabraw recognized that the language of the executive order was not absolute and that it was silent on the issue of reuniting families.[75] Crucially, the government's counsel admitted there was no procedure in place for the reunification of separated families.[76] As a result, the class-wide preliminary

text-trump-executive-order-family-separations-transcript-658639.

[71] GAO Report, *supra* note 59, at 21 ("HHS officials told us that there were no specific procedures to reunite children with parents from whom they were separated at the border prior to the June 2018 court order.").

[72] *See Ms. L.*, 310 F. Supp. 3d at 1136, 1149–50.

[73] *Id.*

[74] *Id.* at 1143 (holding "[o]n the contrary, the context and circumstances in which this practice of family separation [was] being implemented support a finding that Plaintiffs have a likelihood of success on their due process claim").

[75] *Id.*

[76] *Id.* at 1145 (holding "[t]hese situations confirm what the Government has already stated: it is not affirmatively reuniting parents like Plaintiffs and their fellow class members for purposes other than removal. Outside of deportation, the onus is on the parents, who, for the most part, are themselves in either criminal or immigration proceedings, to contact ORR or otherwise search for their children and make application for reunification under the TVPRA. However, this reunification procedure was not designed to deal with the present circumstances. Placing the burden on the parents to find and request reunification with their children under the circumstances presented here is backwards. When children

injunction, among other things, prohibited the government from separating families absent a determination that the parents were unfit or presented a danger to the child.[77] The injunction also prohibited the deportation of any detained parent before reunification with his or her separated children. Further, it mandated the reunification of class members with their children within 30 days if the child was over five years of age and within 14 days if the child was under five years of age.

79.    Despite the *Ms. L.* court's injunction and its clear condemnation of family separations, families remain unlawfully separated to this day. The government experienced delays in reunifying families separated before the *Ms. L.* Injunction because there was no centralized database tracking which child belonged to which parent.[78] In addition, the Trump administration continued to separate families at the border notwithstanding the unequivocal injunction and the executive order purporting to end the practice.[79]

80.    Between the executive order and December 2019, more than 1,100 additional migrant children were separated from their parents, due to what was supposed to be a narrow exception to the executive order—namely that the parent poses a danger or is unfit to take

---

are separated from their parents under these circumstances, the Government has an affirmative obligation to track and promptly reunify these family members").

[77] *Id.*

[78] *Id.* at 1143–44; Joint Status Report at 4, *Ms. L. v. U.S. Immigr. & Customs Enf't*, No.18-cv-00428 (S.D. Cal. July 26, 2018), ECF No. 159 ("In addition, according to Defendant's own data, dozens of separated children still have not been matched to a parent. Moreover, close to a thousand parents remain separated from their children. This includes nearly 500 parents who were removed from the country, most likely without their children.").

[79] John Washington, *The Government Has Taken At Least 1,100 Children From Their Parents Since Family Separations Officially Ended*, THE INTERCEPT (Dec. 9, 2019, 7:56 AM), https://theintercept.com/2019/12/09/family-separation-policy-lawsuit/; Camilo Montoya-Galvez, *The U.S. Continues to Separate Migrant Families. For One Father, A Miscommunication Proved Costly*, CBS NEWS (Dec. 16, 2019, 6:02 AM), https://www.cbsnews.com/news/family-separation-1134-migrant-families-separated-since-end-of-trump-zero-tolerance-policy-aclu/.

care of the child.[80] In some instances, these separations were triggered by "minor offenses committed by the parents, such as traffic violations."[81] The government's own data suggests the number could be even higher, due to wildly inconsistent record keeping.[82]

81.    Given the Trump administration's admissions regarding the purpose of the zero-tolerance policy, the detention center's squalid conditions, and the lack of *any* adequate system to reunify families, it is clear that the government instituted and implemented this policy to inflict emotional distress on the families it separated. It succeeded with devastating consequences for Plaintiffs Elias and John.

## B. ELIAS'S AND JOHN'S FACTUAL ALLEGATIONS

### 1. Elias and his minor son, John, seek asylum in the United States and are taken into CBP Custody.

82.    On or around February 8, 2018, at approximately 9:00 AM, Elias entered the United States at the U.S. Mexico border near Yuma, Arizona, with his minor son John. Shortly after entering the United States, Elias and John approached U.S. Border Patrol officers and sought asylum. Elias is of indigenous heritage and is a co-pastor at an evangelical church in his village in Guatemala. He is from an isolated village in Guatemala with limited communication to the outside world. Spanish is his second language, his formal education is extremely limited, and he is functionally illiterate. He was outspoken against the ethnic discrimination suffered by his cultural group in Guatemala. Plaintiff also preached against organized crime in his church and worked at helping youth avoid recruitment by criminal gangs. As a result, criminal elements in his community, acting in concert with law

---

[80] Montoya-Galvez, *supra* note 77.

[81] *Id.* (explaining how a father and son were separated at the border after a CBP agent claimed that the father and son were not related, even after the father provided the CBP agent with a birth certificate proving he was the father)

[82] Washington, *supra* note 77.

enforcement, assaulted and tortured Elias, causing him to flee his home. Elias fled to the United States with his son John seeking protection for himself and his family.

83.    After taking them into custody, CBP agents took Elias and John to the Yuma County Detention Center in Yuma, Arizona, where immigration officials confiscated their belongings and identification documents.

84.    Elias and John were locked in a cell with about 90 other people for two days at Yuma. The cell was so cold that it has been colloquially referred to as "*La Hielera*," which means "icebox" in Spanish. There were no beds in *La Hielera*. There was not enough space to lie down on the floor and there were not enough aluminum blankets for all detainees. Everyone shared a sink and a toilet. The inhumane conditions did not end there. The only food Elias and John were given each day was one dehydrated ramen noodle cup, uncooked and without water. The only water available was from a sink near the toilet. At some point, Elias asked the immigration officers for water, and the immigration officers responded by asking him, "Who told you to come here?" Elias remained quiet and neither he nor John were given any water.

85.    On various occasions, Elias told immigration officials that he came to the United States seeking asylum. Rather than assess whether Elias had a basis for an asylum claim, based on a well-founded fear of persecution, the immigration officers told Elias that was not their problem, that he entered illegally and was therefore ineligible for asylum, and that the U.S. policies were changed and no longer allowed for asylum.

86.    Instead of noticing Elias for a credible fear interview (CFI) before a USCIS asylum officer, Defendants prosecuted him for illegal entry, and then summarily and illegally deported him without John, who was left behind in ORR custody.

**2.  <u>The United States takes John from Elias.</u>**

87.    Elias and John spent two nights incarcerated together in CBP custody after having been apprehended, along with dozens of other families. On the second day, Elias and John, along with another father and his 6-year-old son, were taken to a CBP office, where

both Elias and the other father were told that they would be separated from their children.

88.    Upon hearing that they would be separated, the 6-year-old child grabbed onto his father's legs and cried out. CBP officers, after restraining the father, forcibly pulled the child from his father's legs and carried him out, all while the child was crying out for his father.

89.    The above-described events caused Elias and John extreme mental anguish. John remained composed but was terrified of being taken from his father and being mistreated. Elias could only restrain himself while pleading that they not be separated. John was taken from Elias, and he did not see his son again for ten months while John was incarcerated by the Government.

### 3.   Elias's continued mistreatment.

90.    Despite his pleas for asylum, Elias was placed in a county jail and prosecuted for illegal entry. He was subsequently placed in ICE custody and was detained for a period of approximately two months. During those two months, Elias suffered extreme depression over having lost his son with no hope of being reunited.

91.    It was not until three weeks after their separation that Elias was able to communicate with John by telephone. It was difficult for Elias to speak with his son because John cried over the suffering he endured in detention. Moreover, John blamed Elias for having brought him to the United States and causing him so much pain, which caused Elias mental anguish.

92.    The separation of Plaintiffs while they were both detained by the Government was a period of extreme distress for Elias. He believed that his son was suffering immensely, that he was responsible for bringing this situation upon them, and he was anxious over being powerless to do anything about it. Elias was subsequently deported to Guatemala without his son despite his refusal to leave his son behind.

### 4.   John is placed in ORR custody in Texas and faces continued mistreatment there.

93.    John was placed in ORR custody after the separation from his father and

placed in Southwest Key facilities in Texas. The effects of his separation were so traumatic that John was transferred to the Shiloh Treatment Facility in Manville, Texas, after he attempted to harm himself. Shiloh is a psychiatric treatment facility for children with behavioral problems that require psychiatric medication.

94.    While at Shiloh, John was prescribed and given psychotropic medication without first obtaining parental consent as required by Texas law. John was required to take this medication despite his parents' opposition.

95.    Shiloh is classified by ORR as a facility that houses immigrant children labeled as "special needs minors." Instead of caring for him, and his specials needs, Shiloh's psychiatrists prescribed psychotropic medication to keep John docile.

96.    John was deported to Guatemala in December of 2018, after ten months in Government detention. His deportation occurred contrary to ORR guidelines which prohibit the release of children directly from a treatment facility. Moreover, John was deported without an adequate supply of medication, and without a plan for his continued treatment in Guatemala.

**5.  The harmful and lasting effects of separation and detention on Elias and John.**

97.    As a result of the separation and prolonged detention, Elias and John continue to experience both physical and psychological symptoms.

98.    When John was in the United States, Elias would cry uncontrollably. He did not feel like the same person. Because he did not gain asylum, Elias felt defeated when he returned to Guatemala as the fear of persecution returned. Elias continues to suffer from anxiety and depression. He often cannot sleep at night because he has nightmares. He often dreams that he is crossing the border again and that he is being separated from his son. He struggles to talk about these experiences as it forces him to relive the trauma.

99.    John has become more rebellious and does not do what he is told. He often says he hates his father, which has caused Elias deep pain. He struggles to talk about the forced separation and cries when he is asked to. He has no appetite and has problems sleeping

with the lights off because he feels like people are touching him. John did not act this way prior to coming to the United States.

100.   DHS arrested and detained, or caused the arrest and detention of, John for a total of approximately ten months. During that period he was separated from Elias, with the Government keeping a minor child in custody away from any parent.

101.   While in custody and during transit, Elias and John were grossly mistreated. The immigration officers engaged in gross negligence, abuse of process, negligent hiring, training, and supervision, and caused intentional and negligent infliction of emotional distress.

**C. JULIO'S AND JUAN'S FACTUAL ALLEGATIONS**

**1.   Julio and his minor son, Juan, seek asylum in the United States**

102.   On or around May 14, 2018, at approximately 11:00 a.m., Julio entered the United States at the U.S. Mexico border near Yuma, Arizona, with his minor son Juan. Shortly after entering the United States, Julio and Juan approached U.S. Border Patrol officers and sought asylum. Julio was the Pastor at Iglesia Principe de Paz in his village of Uspantan, in the department of Quiche in Guatemala. He is from an isolated village in Guatemala with limited communication to the outside world. Spanish is his second language, his formal education is extremely limited, and he is functionally illiterate. As a pastor of the church, he preached frequently against the criminal gangs in his hometown, beseeching the youth not to join these criminal gangs, warning his parishioners against supporting these elements, and railing against them for seeking to recruit children into their criminal gangs.

103.   Julio was forced to seek asylum after he gave a sermon to a local radio station regarding the criminal wave engulfing his community. As he was leaving the station, a group of four men, wearing masks, were waiting for him to exit. He was threatened verbally, ridiculed as a believer in Jesus, pushed, shoved, and then held in a bear hug by one of the men while his companions poured beer on him. They threatened him with his life for preaching against them, threatened his son for refusing to join their group, and ordered him

to leave the country.

104.    Julio and Juan feared for their lives. Julio could not stop preaching the Gospel of God, as that was his vocation and his life. They had no choice but to flee, as they both knew that the men who assaulted Julio were members of the "Mara" violent criminal group, who are known to intimidate people in this manner and whose threats were not idle.

105.    On various occasions, Julio told immigration officials that he came to the United States seeking asylum. Rather than assess whether Julio had a basis for an asylum claim, based on a well-founded fear of persecution, the immigration officers told Julio that was not their problem and that he was ineligible for asylum.

106.    Instead of noticing Julio for a credible fear interview (CFI) before a USCIS asylum officer, Defendants prosecuted him for illegal entry and then summarily and illegally deported him and his son.

**2.    The United States takes Juan from Julio.**

107.    Julio and Juan were taken into CBP custody on May 14, 2018, and, on information and belief, transferred to the Yuma detention facility. They spent a night there, after which a CBP official called out to Juan and asked him to go with him. Julio attempted to follow but was told to remain in the cell and was physically restrained from his son who was forcibly taken away from him.

108.    Despite repeatedly asking for Juan's whereabouts, Julio remained totally in the dark as to what had been done with him for almost two months when he was granted a phone call with Juan.

109.    The above-described events caused Julio and Juan extreme mental anguish. Not knowing of his father's whereabouts weighed heavily on Juan and he frequently found himself crying uncontrollably. Julio was mortified by what had happened to his family as a result of his decision to flee to the United States for safety.

**3.    Julio's continued mistreatment.**

110.    Despite his pleas for asylum, Julio was placed in ICE custody and was

detained, without Juan, for a period of approximately four months. During those four months, Julio suffered extreme depression over having lost his son with no hope of being reunited.

111.   It was not until almost two months after their separation that Julio was able to communicate with Juan by telephone. It was difficult for Julio to speak with his son because Juan choked up over the suffering he endured in detention. Moreover, Juan blamed Julio for having brought him to the United States and causing him so much pain, which caused Julio mental anguish. The separation of Plaintiffs while they were both detained by the Government was a period of extreme distress for Julio. He believed that his son was suffering immensely, that he was responsible for bringing this situation upon them, and he was anxious over being powerless to do anything about it.

112.   Julio was reunited with his son in a family detention center operated by the Defendant, after almost four months, where they both suffered extreme depression over being incarcerated with other families in the same situation—reunited but in detention with no control over obtaining their freedom. They were illegally deported on or about November 7, 2018.

**4.   Juan is Placed in ORR custody in Texas and faces continued mistreatment there.**

113.   Juan was placed in ORR custody after the separation from his father and placed in an ORR facility in Texas. The effects of his separation were traumatic, and he suffered profusely over a period of four months.

114.   Juan has always been very close to his father. He had never been away from him for any extended period of time until his separation and transport to Houston by Defendant's agents. This made his separation excruciating, as Juan felt totally alone with nowhere or no one to reach out to for comfort.

115.   Most harrowing for Juan while separated from Julio was not knowing where his father was or whether he would ever see him again. This caused Juan severe psychological and physical pain, sleeplessness, nightmares, and anxiety attacks.

116.   Juan was not reunited with Julio until about four months after their separation. However, they were reunited in a family detention facility—a dark and depressing place populated by families held in government custody, all waiting in limbo with no information about their freedom or future.

**5.   The harmful and lasting effects of separation and detention on Julio and Juan.**

117.   As a result of the separation and prolonged detention, Julio and Juan continue to experience both physical and psychological symptoms.

118.   When Juan was separated from him, Julio would cry uncontrollably. He did not feel like the same person. Because he did not gain asylum, Julio felt defeated when he returned to Guatemala, as the fear of persecution returned. Julio continues to suffer from anxiety and depression. He often cannot sleep at night because he has nightmares. He often dreams that he is crossing the border again and that he is being separated from his son. He struggles to talk about these experiences as it forces him to relive the trauma.

119.   Juan has become more rebellious and does not do what he is told. He often says he hates his father, which has caused Julio deep pain. He struggles to talk about the forced separation and goes into a shell when he is asked to. He has no appetite and has problems sleeping. Juan did not act this way prior to coming to the United States.

120.   DHS arrested, or caused the arrest of, detained, and took custody of Juan for a total of approximately four months. During that period, he was separated, and a minor child was kept in custody away from his parent for four months, and continued to be kept incarcerated for an additional two months after his reunification with his father. While in custody and during transit, Julio and Juan were grossly mistreated. The immigration officers engaged in gross negligence, abuse of process, negligent hiring, training, and supervision, and caused intentional and negligent infliction of emotional distress.

//

//

**D. AZUL'S AND PEDRO'S FACTUAL ALLEGATIONS**

**1.  Azul and her minor son, Pedro, seek asylum in the United States**

121.   On or around May 10, 2018, Azul entered the United States at the U.S. Mexico border near Yuma, Arizona, with her minor son Pedro. Shortly after entering the United States, Azul and Pedro approached U.S. Border Patrol officers and sought asylum. Azul left her village of Aldea Tocahe, San Pablo, Guatemala for the United States on May 1, 2018, because of death threats she had received from her ex-partner's lover, who was a member of a criminal gang in the community. Azul is from an isolated village in Guatemala with limited communication to the outside world.

122.   Azul entered into a common law marriage with Pedro's father in 2012. However, he became a gang member and money launderer after their union, and as a result, Azul left him five years later in 2017. Pedro's father was enraged by the split, threatened Azul with harm if he ever saw Azul with another man, and refused to help support his son.

123.   Azul was subsequently physically attacked by her former common law husband's lover, who was also a gang member, in a fit of jealousy. Pedro's father's lover threatened to send gang members to kill her for demanding child support from Pedro's father. Azul and Pedro left their home in Guatemala in fear for their lives as Azul knew that the threats she had received were not idle.

124.   On various occasions, Azul told immigration officials that she came to the United States seeking asylum. Rather than assess whether Azul had a basis for an asylum claim based on a well-founded fear of persecution, the immigration officers told Azul that was not their problem, and that she was ineligible for asylum.

125.   Instead of noticing Azul for a credible fear interview (CFI) before a USCIS asylum officer, Defendants prosecuted her for illegal entry, and then summarily and illegally deported her and her son.

**2.  The United States takes Pedro from Azul.**

126.   Azul and Pedro were taken into CBP custody on May 10, 2018, and, on

information and belief, transferred to the Yuma detention facility. They spent two nights there together in a cell with dozens of other families. The cell was so cold that it has been colloquially referred to as "*La Hielera*," which means "icebox" in Spanish. There were no beds in <u>La Hielera</u>. There was not enough space to lie down on the floor and there were not enough aluminum blankets for all detainees. Everyone shared a sink and a toilet. Azul was pregnant at the time. On the second day, agents of the government entered the place where Pedro and Azul were held and took Pedro from Azul. It was traumatic for both of them. Pedro held on to Azul as the agents wrestled him from her grasp, all while Pedro and Azul were crying out loudly.

127.   Despite repeatedly asking for Pedro's whereabouts, Azul had no response and did not have any information regarding his location until Azul was able to speak to him by phone almost three weeks after their separation. Azul was deported without Pedro shortly thereafter, on June 8, 2018, despite being told by Government officials that they would only be deported together if she agreed to be deported voluntarily.

128.   The above-described events caused Azul and Pedro extreme mental anguish. Not knowing his mother's whereabouts weighed heavily on Pedro and he frequently found himself crying uncontrollably. Azul was mortified by what had happened to her family as a result of her decision to flee to the United States for safety.

**3.  <u>Azul's continued mistreatment.</u>**

129.   Azul was detained at the *La Hielera* CBP facility for nine days, along with numerous other families whose children were being separated. It was a terrible time for her. She had no idea what had happened to Pedro or any knowledge of his thereabouts and was wracked with guilt over losing her young son. She had no communication with him during this period. She could hardly sleep. Her space was almost always filled with crying children, which sent her into deep depression and despair.

130.   Despite her pleas for asylum, Azul was placed in a county jail in Arizona and prosecuted for illegal entry. She was subsequently transferred to ICE custody and placed at

a detention facility in Eloy, Arizona on May 19, 2018, before being wrongfully, illegally, and summarily deported, without Pedro, on or about June 9, 2018—under the false pretense that Pedro would be deported along with her.

131.    Azul was pregnant during her nine-day stay at *La Hielera*. She suffered from stomach pains and asked for help, yet when she complained officials shouted at her that she had no basis to be in the country, let alone to ask for special treatment. She was also told that it was not their fault she decided to come to the United States illegally.

**4.   Pedro is placed in ORR Custody in Texas and Faces continued mistreatment there.**

132.    Pedro was a child barely six years old when he was forcibly separated from his mother. The separation that unfolded before Pedro—a child not yet at the age of reason— was incomprehensible. All he could do was cry. Which he did uncontrollably and continuously for hours after his separation.

133.    Pedro has always been extremely close to his mother. They were inseparable since his birth. This made the separation excruciating for him, as Pedro felt alone and isolated without his mother, with nowhere and no one to turn for comfort or relief.

134.    Pedro was sent off to an ORR Detention facility across the country from Azul in Cayuga, New York, after his separation. This place was totally foreign to Pedro, which contributed to his depression, including anxiety, loss of appetite, sleeplessness, and inability to trust anyone around him.

135.    Most harrowing for Pedro was not knowing where his mother was or whether he would ever see her again. This caused Pedro severe psychological and physical pain and suffering.

136.    Pedro was allowed only one phone call with his mother, during the month Azul was incarcerated in the United States, increasing his depression and fear of never seeing her again.

137.    Pedro was detained for almost three months before he was deported on August

5, 2018, without his mother, along with adult deportees, to a military base in Guatemala, causing Pedro even more mental anguish and fear.

**5.  The harmful and lasting effects of separation and detention on Azul and Pedro.**

138.   As a result of the separation and prolonged detention, Azul and Pedro continue to experience both physical and psychological symptoms.

139.   When Pedro was separated from his mother, Azul would cry uncontrollably. She did not feel like the same person. Because she did not gain asylum, Azul felt defeated when she returned to Guatemala, as the fear of reprisal from the criminal gang returned. Azul continues to suffer from anxiety and depression. She often cannot sleep at night because she has nightmares. She often dreams that she is crossing the border again and that she is being separated from her son. She struggles to talk about these experiences as it forces her to relive the trauma.

140.   Pedro has become more rebellious and does not do what he is told. He often says he hates his mother, which has caused Azul deep pain. He struggles to talk about the forced separation and goes into a shell when he is asked to. He has no appetite and has problems sleeping. Pedro did not act this way prior to coming to the United States.

141.   DHS arrested, or caused the arrest of, detained, and took custody of Pedro for a total of approximately three months. During that period, he was separated, and a minor child of tender age was kept in custody away from his parent for a prolonged period of time. While in custody and during transit, Azul and Pedro were grossly mistreated. The immigration officers engaged in gross negligence, abuse of process, negligent hiring, training, and supervision, and caused intentional and negligent infliction of emotional distress.

**F.  PLAINTIFFS ARE PREVENTED BY DEFENDANTS FROM FILING FTCA CLAIMS**

142.   Defendant's illegal deportation of Plaintiffs prevented them from filing a

claim under the Federal Tort Claims Act until September of 2021, when they were granted re-entry via humanitarian parole pursuant to the *Ms. L.* litigation.

143.  Equitable tolling is appropriate in this case because Plaintiffs' illegal deportation physically prevented them from accessing a functioning court, and there was no possibility of gaining tort relief in court during the period when they would have otherwise been required to bring their case.

144.  Plaintiffs' inability to bring a claim against Defendant, within the time limit otherwise provided by law, was caused directly by the Defendant's wrongful and illegal action in summarily deporting them without considering their asylum claims. Defendant physically prevented Plaintiffs from accessing a court to plead their claims, as they were not able to effectively prosecute Plaintiffs' claims while in Guatemala, and they would have been precluded from appearing at any of the proceedings that are required of a civil litigant, including depositions, discovery proceedings, and ultimately, a trial. Even if Plaintiffs had filed tort claims against the Government from Guatemala, they had no real possibility of gaining relief in court while prevented from re-entering the United States to prove their claims.

145.  Plaintiffs diligently pursued their and their children's return to the United States in order to regain access to a functioning court, to assert their tort claims against the Government, and they diligently attempted to mitigate losses.

146.  The personal circumstances of plaintiffs that prevented them from asserting their claims are extraordinary, making equitable tolling appropriate in each case.

147.  Plaintiffs returned to the United States, pursuant to humanitarian parole issued on their behalf by the government as a result of their active participation in the *Ms. L.* class litigation.

## G. THE GOVERNMENT'S SEPARATION OF PLAINTIFFS WAS UNCONSTITUTIONAL

148.  The government's family separation policy intentionally violated the

constitutional rights of those separated, including Plaintiffs' substantive due process right to family integrity. The separation policy was motivated by discriminatory animus towards Latino immigrants of Central American origin, in particular, who were targeted for deprivation of these fundamental rights.

149.    The United States Supreme Court has consistently recognized that the parent-child relationship is constitutionally protected, regardless of the parent or child's citizenship status.[83]

150.    The freedom from discrimination by the government on the basis of race or national origin has also long been recognized as "extend[ing] to anyone, citizen or stranger, who is subject to the laws of a State," even those not lawfully present.[84]

151.    Yet the United States, through this unconstitutional policy, forcibly separated Central American immigrant children from their parents, including Plaintiffs, sent children thousands of miles away without informing their parents, failed to provide basic health and safety care in violation of federal law, and failed to provide an adequate system to track the children or ensure the reunification of families.

152.    As Judge Sabraw held in *Ms. L.*, the government's "egregious" and "outrageous" action with respect to separating parents from children likely violated due process. Judge Sabraw described the policy and practice as one that "shocks the conscience" and "is so brutal and offensive that it does not comport with traditional ideas of fair play and decency."[85]

153.    Additionally, Judge Friedman of the United States District Court for the District of Columbia held in a related suit that "nothing in federal law suggests that deterring immigration by indefinitely separating families once the parents have been transferred to

---

[83] *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978); *Wisconsin v. Yoder*, 406 U.S. 205, 231–33 (1971); *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944).

[84] *Plyler v. Doe*, 457 U.S. 202, 215 (1982) (emphasis removed).

[85] *Ms. L.*, 310 F. Supp. 3d at 1142, 1145–46 (internal quotations and citation omitted).

immigration custody is a compelling or legitimate government objective."[86]

154.    The federal government here deliberately violated Plaintiffs Elias's and John's constitutional rights, including their right to family integrity and equal protection, and purposefully inflicted trauma on Plaintiffs—a trauma they will carry with them for the rest of their lives.

**CLAIMS FOR RELIEF**

**COUNT ONE**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

155.    Plaintiffs re-allege each allegation in the preceding paragraphs as fully set forth herein.

156.    By engaging in the acts described in this Complaint, Defendant, acting by and through the federal agencies, federal officials, and federal employees referenced above, engaged in extreme and outrageous conduct with an intent to cause, or with a reckless disregard of the probability of causing, Plaintiffs to suffer severe emotional distress.

157.    Defendant intended to cause, and did cause, Plaintiffs and their children to suffer severe emotional distress by forcibly separating them from one another without their consent, despite the obvious trauma and terror caused by the separation.

158.    Defendant intended to cause, and did cause, Plaintiffs to suffer severe emotional distress by separating Plaintiffs from their children while they were being held in immigration custody and failing to reunify them in the United States.

159.    Defendant intended to cause, and did cause, Plaintiffs and their children to suffer severe emotional distress by, *inter alia*, failing to develop and implement a system for tracking the existence of the parent-child relationship, withholding from Plaintiffs any information about their children's whereabouts or well-being, failing to allow them to communicate with their children, and failing to give any indication that Plaintiffs would ever

---

[86] *Jacinto-Castanon de Nolasco v. U.S. Immigr. & Customs Enf't*, 319 F. Supp. 3d 491, 502 (D.D.C. 2018).

be reunited with their children.

160.   Defenant further intended to cause, and did cause, Plaintiffs and their children to suffer severe emotional distress by subjecting Plaintiffs and their children to inhumane detention conditions prior to and during their separation.

161.   Defendant intended to cause, and did cause, Plaintiffs and their children to suffer severe emotional distress by failing to plan for or obtain resources to meet the increase in children designated as unaccompanied minors as a result of the family separation policy, failing to provide a child welfare or child safety justification for forcibly separating children from their parents, failing to track families, and failing to develop any sort of reunification plan until ordered to do so by a federal judge.

162.   Defendant's behavior was extreme and outrageous under the circumstances.

163.   As a direct and proximate result of that conduct, Plaintiffs and their children suffered severe emotional distress throughout their time in Defendant's custody and continue to suffer the lasting effects of that distress today.

164.   John suffers from depression, anxiety, and lack of ability to concentrate. He has problems at school because he is very restless. Before what happened he was very happy and social, but after the trauma he suffered he is very quiet. He stays in his room and speaks only when he is asked something, interacting little with others. When he was in the shelter he saw things, talked to himself, and had panic and anxiety attacks. On one occasion they had to take him tied down to the hospital, where they prescribed medication to calm him down and he had psychological therapy.

165.   Today Elias still experiences depression and sadness from seeing his son always withdrawn, locked in his own thoughts, also anxiety and panic attacks. He says that it is something that they will never forget because of all the trauma and damage it caused in their lives.

166.   Julio remains depressed and suffers from lack of appetite because of the mistreatment and lack of food when he was in *La Hielera*. He still has fears and anxiety

because the detention officers threatened them repeatedly. The officers told Julio and the other detainees that they were in the officers' hands and that the officers could make them disappear and no one would notice. or claim them because no one knew they were there. They were treated like criminals. On one occasion, the tear gassed the detainees. They would also take the detainees to the dining room and once there they would say there was no food and return them to their cells with nothing to eat. To this day, being at home, he wakes up in the middle of the night terrified that he is back in detention. Because of the trauma, Julio suffers from memory issues, has trouble concentrating, and feels that he has lost control of his life.

167.   Juan also suffers from depression. He lacks motivation, concentration, and appetite, and he also experiences panic attacks.

168.   Azul suffers from depression and anxiety. She lives in constant fear of losing her children and of the sirens of patrol cars and emergency service vehicles. She now associates those sounds with the terror that something will happen to her children. She has eating and appetite issues because when they were in *La Hielera* they were given raw food, sometimes only once a day.

169.   Pedro suffers panic attacks and has developed learning disabilities since the trauma of the separation. He is very low in his academic level.  He has anxiety and eating issues because in the home he was placed they would hide and limit his food. He is also terrified of both the dark and being alone because he was locked in a closet at times while he was separated. When he goes to the bathroom someone has to be with him.

170.   Under the Federal Torts Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680, the United States is liable to Plaintiffs and their children for intentional infliction of emotional distress.

## **COUNT TWO**

### **NEGLIGENCE**

171.   Plaintiffs re-allege each allegation in the preceding paragraphs as though fully

set forth herein.

172. Defendant, acting by and through the federal agencies, federal officials, and federal employees referenced above, had a duty to Plaintiffs and their children to act with ordinary care and prudence so as not to cause harm or injury to Plaintiffs and their children. They also had mandatory, non-discretionary duties, including, but not limited to, those imposed by the United States Constitution, the Flores consent decree, federal statute, and federal regulations.

173. Defendant acted unreasonably by violating its duties while Plaintiffs and their children were in Defendant's custody.

174. Defendant violated those duties by, *inter alia*, forcibly separating Plaintiffs and their children from one another without their consent and despite the obvious trauma and terror caused by the separation.

175. Defendant violated those duties by, *inter alia*, separated Plaintiffs and their children while both were being held in immigration custody and failing to reunify them in the United States.

176. Defendant violated those duties by, *inter alia*, failing to develop and implement a system for tracking the existence of the parent-child relationship, withholding from Plaintiffs any information about their children's whereabouts or well-being, failing to allow Plaintiffs and their children to communicate with each other, and failing to give any indication that Plaintiffs and their children would ever be reunited.

177. Defendant violated those duties by, *inter alia*, subjecting Plaintiffs and their children to inhumane detention conditions prior to and during their separation.

178. Defendant violated those duties by, *inter alia*, failing to plan for or obtain resources to meet the increase in children designated as unaccompanied minors as a result of the family separation policy, failing to provide a child welfare or child safety justification for forcibly separating children from their parents, failing to track families, and failing to develop any sort of reunification plan until ordered to do so by a federal judge.

179.   By engaging in the acts alleged herein, Defendant failed to act with ordinary care and breached its duty of care owed to Plaintiffs and their children.

180.   As a direct and proximate result of the referenced conduct, Plaintiffs and their children suffered substantial damages.

181.   Under the Federal Torts Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680, the United States is liable to Plaintiffs and their children for negligence.

**COUNT THREE**

**LOSS OF CONSORTIUM FOR HARM TO PARENT-CHILD RELATIONSHIP**

182.   Plaintiffs re-allege each allegation in the preceding paragraphs as though fully set forth here.

183.   As a result of the acts alleged herein, Plaintiffs and their children suffered severe, permanent, and disabling injuries.

184.   Plaintiffs and their children must now cope with the long-term mental health effects and trauma caused by the Defendant, federal officers, and officials referenced above.

185.   These injuries substantially interfere with the capacity of Plaintiffs to interact with their children in a normally gratifying way.

186.   Plaintiffs' and their children's parent-child relationships have been severely strained by the emotional trauma caused by Defendant's actions.

187.   Under the Federal Torts Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680, the United States is liable to Plaintiffs for loss of consortium.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request:

A.   Award compensatory damages to Plaintiffs for the harms they suffered as a result of Defendant's unconstitutional and unlawful conduct;

B.   Award Plaintiffs their costs and attorney's fees pursuant to, among other provisions, the Equal Access to Justice Act, 28 U.S.C. § 2412; and

C.   Award such other and further relief as the Court deems just and appropriate.

DATED: November 5, 2024.    **O'STEEN & HARRISON, PLC**

_____

Lincoln Combs

Ricardo de Anda
**DE ANDA LAW FIRM**
*Attorneys for Plaintiff*